UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TERESA M. REINKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:04-CV-1737-DFH-TAB |
| | ) | |
| JO ANNE B. BARNHART, Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON JUDICIAL REVIEW

The Commissioner of Social Security found that plaintiff Teresa Reinke has

been disabled after her 55th birthday in March 2004, but the Commissioner

denied her application for disability insurance benefits for a period before that

date.  Acting for the Commissioner, Administrative Law Judge ("ALJ") Albert J.

Velasquez determined that Ms. Reinke was not disabled under the Social Security

Act because she retained the residual functional capacity to perform light

exertional work with certain specified limitations.  Ms. Reinke contends that the

ALJ erred by (1) failing to accord proper weight to the opinion of her treating

physician as to her functional capacity to perform physical job functions such as

standing, walking, and lifting; and (2) by improperly omitting a mental impairment

limitation to simple or unskilled work from the residual functional capacity

finding.  As explained below, the ALJ's decision contains errors, but they did not

affect the result.  Accordingly, the partial denial of benefits is affirmed.

*Background*

Ms. Reinke applied for disability insurance benefits in May 2000.  Pr. R. 54-56.[1]   After Ms. Reinke's application was denied both initially and upon reconsideration, she requested a hearing before an ALJ.  The hearing was held, and after receiving an unfavorable decision, Ms. Reinke appealed the ALJ's denial of benefits.  While pursuing the appeal of her first hearing before an ALJ, Ms. Reinke filed another application for disability insurance benefits in July 2002.  R. 104-06.   Rather than filing a brief in support of the ALJ's denial, the Commissioner herself moved for a remand for a fresh look at the case.  After the remand, ALJ Velasquez held a hearing on both disability applications on March 30, 2004.  An additional hearing was held on July 26, 2004, and the ALJ issued a partially favorable decision in August 2004.  R. 7, 12.

Teresa Reinke was 55 years old with an eleventh grade education when the ALJ partially denied her claim for disability benefits in August 2004.  Her past work included positions as a material handler and a waitress.  R. 197, 134.  Ms. Reinke claimed to suffer from osteoarthritis, hypertension, degenerative joint disease, degenerative disc disease, obesity, non-insulin dependent diabetes, and

---

[1]The record for Ms. Reinke's initial appeal before this court, Cause No. 1:02-CV-01988-JDT-TAB ("2002 appeal"), contains information at issue in Ms. Reinke's present appeal and was omitted from the record in the present appeal.  Both parties have cited the record in the 2002 appeal in their arguments, and the court has obtained the record in that case.  The record of the 2002 appeal is cited with the reference "Pr. R."

other conditions.  Ms. Reinke claimed that she had been disabled within the meaning of the Act since November 1999.

Ms. Reinke sustained work-related injuries to her shoulders in 1997. Additionally, October 1997 treatment notes from Barth Conard, M.D., state that an MRI of Ms. Reinke's knee showed "essentially normal" results, "with the exception of a patellofemoral syndrome," which Dr. Conard noted is also called "chondromalacia."  R. 221; see also R. 236 (MRI results stating that Ms. Reinke had "mild patellofemoral DJD").  Dr. Conard noted that, despite some relief from a trigger point injection, Ms. Reinke complained of thoracic, lumbar, shoulder, and neck pain.  R. 221.

Ms. Reinke also sought treatment with J. Paul Kern, M.D., for pain in her neck, left shoulder, left scapula, and lower back.  R. 619.  In 1999, Ms. Reinke underwent surgery on both shoulders.  Pr. R. 201, 211.  She attended physical therapy from July through December 1999.  R. 577-605.

A radiology report prepared by Benjamin Kuzma, M.D., describing the results of an MRI in November 1999 stated that the tests showed that Ms. Reinke had a mild disc desiccation with preservation of disc height and trace disc bulge at L4-5.  The test showed no protrusion, extrusion, or annular tear.  The test showed hypertrophic facet degenerative change present bilaterally, as well as ligamentous thickening.  Dr. Kuzma noted, "[a] mild secondary stenosis results,"

and that "[n]either recess nor foramen [was] encroached significantly." Pr. R. 256. The results were otherwise normal.  *Id.*

In December 1999, Greg T. Hardin, M.D., noted that Ms. Reinke was pleased with her progress in both shoulders after surgery, and noted that she continued to have some tenderness and limitations with the right shoulder and that she had some limitations with external rotation and adduction in her left shoulder.  Dr. Hardin noted that Ms. Reinke's condition had improved with therapy, and that, pending the results of a functional capacity evaluation, he would recommend limitations including "minimal overhead work and no lifting over 20 pounds."  Pr. R. 261.

Later in December 1999, physical therapist Sheila Denman performed a functional capacity evaluation of Ms. Reinke.[2]  Denman's functional capacity evaluation form stated that Ms. Reinke was capable of the following:  (1) sitting for six to eight hours per day with regular breaks; (2) standing  for six to eight hours per day with breaks at 30 minute intervals; (3) walking six to eight hours per day at intervals of one-quarter mile; (4) lifting up to 22 pounds frequently and up to 45 pounds occasionally; (5) occasionally bending, squatting, kneeling, and climbing stairs; (6) frequently bending, crawling, climbing ladders, working overhead, pushing/pulling; and (7) "constantly" performing simple and firm

---

[2]The assessment stated that it was "not intended to be used for permanent disability rating purposes."  R. 627.

grasping and fine manipulation.  The evaluation also stated that Ms. Reinke was capable of full trunk rotation, sidebending, and trunk extension, and capable of partial head/neck flexion.  Overall, the evaluation stated that Ms. Reinke could meet a medium physical demand level.  See R. 631.

Following Denman's functional capacity evaluation, Dr. Kern wrote that Ms. Reinke had reached maximum medical improvement in December 1999.  Dr. Kern also wrote that, based on the functional capacity evaluation results, Ms. Reinke had the following permanent restrictions:

    – No lifting over 40 lb on an occasional basis from the floor.
    – No lifting over 25 lb on an occasional basis, at shoulder or above shoulder.
    – No standing over 30 minutes without a position change.
    – No walking over 440 yards without a position change.

R. 608.  Dr. Kern opined that Ms. Reinke had a "2% whole person impairment based on the spinal impairment."  Id.

In January 2000, Dr. Hardin completed a progress report stating that Ms. Reinke had permanent restrictions and could function at "medium capacity."  He wrote that she could not stand for more than 30 minutes without a break, could occasionally lift 25 pounds overhead, could occasionally pull 40 pound stacks down, occasionally carry and lift 45-90 pound pallets, and could engage in occasional climbing.  Pr. R. 260.

-5-

In March 2000, Todd E. Midla, D.O., prepared an examination report regarding Ms. Reinke, who complained to Dr. Midla of pain in her shoulders and lower back.  Dr. Midla noted that an MRI of Ms. Reinke's thoracic spine was negative and that an MRI of her lumbar spine showed a degenerative disc at L4-5.  Dr. Midla listed his diagnoses as:  (1) status post rotator cuff impingement surgery bilateral shoulders with the left continuing to have pain and impingement signs; and (2) sprain/strain of the thoracolumbar spine with continued back pain.  Pr. R. at 289-90.  Dr. Midla evaluated Ms. Reinke as having a whole person impairment of 19%, taking into account her impairments in her back, arms, and shoulders.  *Id.*

July 20, 2000 notes from Wael A. Harb, M.D., state that Ms. Reinke had normal gait and station, that she was able to walk on toes and heels without difficulty, and that she was able to squat "only 50%."  Pr. R. 292.  Dr. Harb also noted that Ms. Reinke had limited range of motion of the dorsal lumbar spine, in the shoulders, and in the left wrist.  Dr. Harb also noted an impression of "chronic bilateral knee pain for osteoarthritis."  *Id.*

On October 2000, Dr. Conard noted that Ms. Reinke had constant pain in both shoulders, reduced motion in her left shoulder, as well as "lots" of low back pain.  R. 219.  In November 2000, Dr. Conard noted that a bone scan revealed that Ms. Reinke had slight increased uptake in her AC joints consistent with mild degenerative arthritis.  R. 231.  Ms. Reinke had intra-articular facet injections and

nerve blocks that relieved some of her pain.  R. 229-30.  Ms. Reinke had another intra-articular facet injection in January 2001 that reduced her pain.  R. 228.  Dr. Conard's December 2000 treatment notes state that Ms. Reinke's shoulder pain had improved, likely because of her treatment with Celebrex.  R. 218.  After two facet shots "did not help," however, Dr. Conard noted that Ms. Reinke was experiencing "total body malaise" and prescribed Mobic in February 2001.  *Id.*  Dr. Conard noted that the "Mobic [was] working," and that Ms. Reinke was having left shoulder pain in March 2001.  In April 2001, Dr. Conard noted that although Ms. Reinke's condition had improved, she was "disabled."  R. 217.

From November 2000 through February 2001, Ms. Reinke sought mental health counseling at Howard Community Hospital's Outpatient Behavioral Health Services.  Pr. R. 393-415.  A psychiatric treatment plan review form signed by a physician in February 2001 listed Ms. Reinke's Axis I diagnoses as Partner Relational Problem and Depressive Disorder, NOS, deferred Ms. Reinke's Axis II diagnosis, and listed her GAF at 60.  Pr. R. 393.[3]

On June 4, 2001, Ms. Reinke saw Aldo A. Buonanno, M.D., for a mental status examination.  Dr. Buonanno diagnosed Ms. Reinke as having an Axis I

---

[3]GAF stands for Global Assessment of Functioning.  It is a mental health rating that estimates a person's psychological, social, and occupational capacities. American Psychological Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. Text Revision 2000).  A GAF of 60 is the highest rank in a range that indicates "Moderate symptoms (e.g., depressed mood and mild insomnia) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)."  *Id.* at 34.

"Adjustment Disorder with Depressed Mood – 309.0 including marital problems."
He noted her past history of medical problems in his Axis III and IV assessments,
and evaluated her GAF at 47.  Pr. R. 313-15.  Dr. Buonanno completed a "Medical
Assessment of Mental Ability to do Work-Related Activities" ("Mental Assessment")
form that same day.  In response to a question as to the limitations that Ms.
Reinke's condition imposed on her ability to tolerate normal work activities, Dr.
Buonanno answered:  "Mentally ok," but noted that Ms. Reinke had "physical
problems" that interfered with her ability to work.  When asked about the extent
to which her condition interfered with her ability to perform simple repetitive
tasks, Dr. Buonanno answered "mentally ok."  Pr. R. 316-17.  Dr. Buonanno also
completed a "Medical Source Statement of Ability to do Work-Related Activities
(Mental)" ("Mental Source Statement"), also on June 4, 2001.  Dr. Buonanno
evaluated Ms. Reinke as having a "marked" restriction in understanding and
remembering both detailed and short, simple instructions.  Pr. R. 318-19.  He
evaluated her as having no restriction in carrying out short, simple instructions,
but having moderate restrictions in carrying out detailed instructions.  He
evaluated her as having slight restrictions in making judgments on simple work-
related decisions.  Dr. Buonanno left blank the question asking what medical or
clinical findings supported his evaluation on these items.  *Id.*

An addendum to Dr. Buonanno's previous opinions was added to the record
on October 15, 2001.  The addendum states that the Disability Determination
Bureau contacted Dr. Buonanno for clarification of his medical source statements

and his GAF evaluation.   According to the contact notes, after Dr. Buonanno reviewed his statements regarding Ms. Reinke, he concluded that his evaluation needed amendment, submitted a corrected copy of his opinion, and amended his GAF evaluation of Ms. Reinke to 57.  Pr. R. 320.[4]  His updated "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" ("updated Source Statement") stated that Ms. Reinke had no restriction in understanding, remembering, and carrying out simple instructions.   The updated Source Statement stated that Ms. Reinke had marked restrictions in understanding and remembering detailed instructions, and moderate restrictions in carrying out such instructions.   It also stated that Ms. Reinke had slight restrictions in making judgments on simple work-related decisions.  Pr. R. 321.[5]

_____

[4]A GAF of 57 indicates "Moderate symptoms (e.g., depressed mood and mild insomnia) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)," whereas a GAF of 47 indicates "Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g, no friends, unable to keep a job)."   American Psychiatric Association, *supra* note 4, at 34.

[5]Ms. Reinke objects to consideration of Dr. Buonanno's signed amendment to his initial evaluation, offering as the only basis for her objection that it "is unclear how this revision came to pass."  Pl. Reply Br. at 4.  The regulations provide that the ALJ may contact a medical source by telephone and request "additional evidence or clarification" from the source when the source's report "contains a conflict or ambiguity that must be resolved," or where "the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1512(e).   Dr. Buonanno's initial evaluation assigned Ms. Reinke a GAF rating indicating severe impairments, but also stated that she was "mentally ok," had no suicidal ideation, had friends and got along with others, pursued hobbies and interests.   He also left blank the questions regarding medical or clinical findings supporting his assessment.  See R. 313-19.  Accordingly, the ALJ did not err by  contacting Dr. Buonanno or considering his amended opinion.

Ms. Reinke attended physical therapy from February 2001 through May 2002.  R. 633-51.  In April 2002, Ms. Reinke sought emergency room treatment for back pain, and was diagnosed with a herniated lumbar disc.  R. 408.  A radiology report after a lumbar spine MRI, prepared by Thomas Vaughn, M.D., stated that Ms. Reinke had a "degenerative Grade I 4-5 anterolisthesis."  Dr. Vaughn wrote that there was marked bilateral facet arthropathy and a mild concentric disc bulge, but no central or foraminal or lateral recess stenosis, or any other convincing evidence of nerve root impingement.  R.  223.

Treating sources Trisha Hacker, LCSW, and Erika Cornett, M.D., completed a "Report of Psychiatric Status" regarding Ms. Reinke's condition in September and October 2002.  The report stated that Ms. Reinke had Axis I diagnoses of "Partner Relational Problem" and "Depressive Disorder NOS" and deferred any Axis II diagnoses.  The report stated that Ms. Reinke's GAF was at 60, and stated that this rating was Ms. Reinke's highest rating in the past year.  R. 263.  The report stated that Ms. Reinke's remote memory was more intact than her recent memory, and that she exhibited some problems with focusing.  R. 265-66.  The report stated that Ms. Reinke would likely have difficulty with focus or memory if her work routine required "more than a few things to be done at a time," that she would "need to be told things step by step," and that she experienced "forgetfulness/difficulty completing tasks."  R. 267.  As an example, the report stated that Ms. Reinke was attending a computer course, that Ms. Reinke reported

studying for exams in the course, but could not "remember anything" when she took the exams and left the course after receiving poor grades.  *Id.*

In April 2002, Ms. Reinke sought treatment with Dr. Conard for pain in her knees.  Dr. Conard noted that Ms. Reinke used a cane and had "a lot of pain," but that her MRI was "fairly unremarkable."  Dr. Conard noted that Ms. Reinke had reproducible pain in her trochanteric bursa, gave her an injection, and recommended therapy.  R. 215.  In May 2002, Dr. Conard noted that Ms. Reinke saw him for a broken toe injury she had sustained and that he had prescribed Cipro for Ms. Reinke's "prepatellar infection."  Dr. Conard noted that Ms. Reinke's toe "continue[d] to look great" after treatment in May 2002.  R. 214.  Despite improvement in her knee after treatment, however, Ms. Reinke returned to Dr. Conard for treatment of her left knee in June 2002.  *Id.*  An MRI of Ms. Reinke's knee showed mild patellofemoral DJD and a small Baker's cyst.  R. 222.  In July 2002, Dr. Conard noted that Ms. Reinke's MRI showed that she had patellofemoral disease and also stated that upon examination, he detected patellofemoral crepitants bilaterally.  R. 214.

In December 2002, Richard S. French, M.D., prepared a report following a neurology consultation with Ms. Reinke.  Dr. French stated that an EMG showed Ms. Reinke had lumbar radiculopathy involving L4 on the left and possibly L4 and L5 on the right.  Dr. French wrote that Ms. Reinke had "definite denervation bilaterally in the paralumbar muscles and a decreased left knee jerk with

denervation in the left quadriceps." He also noted probable denervation in the tibialis anterior muscles. R. 163-64.

Ms. Reinke underwent therapeutic lumbar injections in January and February 2003. R. 159-62. Between injections, Dr. Conard noted that Ms. Reinke was taking up to 12 Lortab pills per day and expressed concern that she was taking too much medication. R. 172. John W. Deitz, M.D., examined Ms. Reinke in December 2003 and assessed her as having degenerative spondylolisthesis and lumbar spinal stenosis. R. 856. Ronald S. Miller, M.D., gave Ms. Reinke an interlaminar epidural steroid injection in January 2004. R. 859.

A 2003 Psychiatric Review Technique form completed by R. Klion, Ph.D., stated that Ms. Reinke had non-severe impairments of affective disorders. R. 248. Dr. Klion noted that Ms. Reinke had decreased energy, and evaluated her as having mild limitations in her activities of daily living and in maintaining concentration, persistence, or pace. R. 251, 258.

ALJ Velasquez conducted the March 30, 2004 hearing. Ms. Reinke and vocational expert Constance Brown testified at the hearing. Ms. Reinke testified that she had pain in her lower back that ran down her left leg. She rated the pain as an 8 on a scale of 1 to 10, with 10 being the worst pain. She also testified that her knee sometimes buckled beneath her and that she could stand still while cooking for 15 to 20 minutes at a time before her pain became too great. R. 51.

She also testified that she could not walk more than one-half a block and that her pain had worsened since the previous hearing.  R. 52.  Ms. Reinke testified that she could not lift her left arm "all the way up," which interfered with her grooming and dressing herself.  R. 56.

Ms. Reinke testified that she pursued courses at Ivy Tech State College through vocational rehabilitation, but that when she was given a test, her mind "went blank," and she left in tears and had not returned.  R. 52.  She testified that she received mental health treatment as well.  R. 53.

After Ms. Reinke testified regarding her limitations, the ALJ posed the critical hypothetical question to the vocational expert:

> "Okay.  Ms. Brown, let's assume a hypothetical person the Claimant's age, education, and work experience.  Capable of work at the light exertion level, provided the work would allow the individual to alternate into a sitting or a standing position at their option every one or two minutes – I'm sorry, for one or two minutes every hour or so.  And that the work involved no more [than] occasional bending or squatting or climbing of stairs or ramps, with no kneeling, no crawling, no climbing of ropes, ladders, or scaffolds.  The individual should avoid work at unprotected heights, around dangerous moving machinery, or operating a motor vehicle.  And work should not require overhead work with the left shoulder."

R. 59-60.  The vocational expert opined that such an individual could perform work as a cashier, mail clerk, general office clerk, traffic shipping and receiving clerk, and a stock inventory clerk.  *Id.*

ALJ Velasquez held a supplemental hearing in the matter on July 26, 2004. Ms. Reinke's counsel called the ALJ's attention Dr. Conard's 2001 physical capacity evaluation of Ms. Reinke.  The ALJ then questioned Ms. Reinke:

> ALJ:      Um-hum.  And when – so when was the last time you saw Dr. [Conard]?
>
> CLMT:    Oh, a couple of years ago.
>
> ALJ:      So who are you seeing now?
>
> CLMT:    Dr. Geets and Dr. Ahorn [phonetic] with Ortho [Indy].
>
> ALJ:      And they haven't issued anything like this?
>
> CLMT:    Oh, no.
>
> ALJ:      Okay.  We'll throw that one out.  What else we got?  Not a treating source anymore.  A treating source at the time, maybe.

R. 70.  The ALJ issued an opinion in August 2004 finding that Ms. Reinke was not disabled until March 2004, when she reached age 55, which the "Grids" treat as "advanced age."  R. 21.

*The Disability Standard*

To be eligible for the disability insurance benefits she seeks, Ms. Reinke must demonstrate that she was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that had lasted or could be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d).  This showing would be presumed if Ms. Reinke's impairments met or medically equaled

-14-

any impairment listed in Part 404, Subpart P, Appendix 1 of the implementing regulations, and if the duration requirements were met. 20 C.F.R. § 404.1520(d). Otherwise, Ms. Reinke can establish disability only if her impairments were of such severity that she was unable to perform both her previous work and any other substantial work available in the national economy. *Id.* at (f) & (g).

This eligibility standard is stringent. Unlike many private disability insurance programs, the Social Security Act does not contemplate degrees of disability and does not allow for an award based on a partial disability. *Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1989). The Act provides important assistance for some of the most disadvantaged members of the American society. But before tax dollars – including tax dollars paid by others who work despite serious and painful impairments – are available as disability benefits, it must be clear that the claimant has an impairment severe enough to prevent her from performing virtually any kind of work. Under the statutory standard, these benefits are available only as a matter of nearly last resort.

The implementing regulations for the Act provide the familiar five-step process to evaluate disability. The steps are:

(1)    Has the claimant engaged in substantial gainful activity? If so, she was not disabled.

(2)    If not, did the claimant have an impairment or combination of impairments that are severe? If not, she was not disabled.

(3)     If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)     If not, could the claimant do her past relevant work?  If so, she was not disabled.

(5)     If not, could the claimant perform other work given her residual functional capacity, age, education, and experience?  If so, then she was not disabled.  If not, she was disabled.

See generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

### Standard of Review

If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court. 42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses.  *Cannon v. Apfel*,

213 F.3d 970, 974 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).

The court must examine the evidence that favors the claimant as well as the evidence that supports the Commissioner's conclusion. *Zurawski*, 245 F.3d at 888. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). Also, the ALJ must explain the decision with "enough detail and clarity to permit meaningful appellate review." *Briscoe*, 425 F.3d at 351.

*Discussion*

Applying the five-step process, the ALJ found that Ms. Reinke satisfied step one because she had not engaged in substantial gainful employment since the alleged onset date. At step two, the ALJ found that Ms. Reinke's osteoarthritis, degenerative joint disease status post acromioclavicular joint repair, degenerative disc disease, and obesity were "severe" within the meaning of the Act. He found that her left toe fracture, hypertension, non-insulin dependent diabetes mellitus, partner relational problem, dysthymia, adjustment disorder with depressed mood, and major depression did not constitute "severe" impairments within the Act. The

ALJ found that Ms. Reinke failed to meet the requirements for step three because her severe impairments did not meet or equal a listed impairment.  At step four, the ALJ found that Ms. Reinke was unable to do her past relevant work.  At step five the ALJ found that Ms. Reinke was capable of engaging in a significant range of light work existing in substantial numbers in the State of Indiana before she reached the age of 55 and was not disabled within the meaning of the act before that date.  Relying on Medical-Vocational Rule 202.11 (in the "Grids"), the ALJ found that Ms. Reinke was disabled within the meaning of the act on and after that date.  R. 19-21.

Ms. Reinke challenges the ALJ's finding that she was not disabled before March 2004.  First, she contends that the ALJ failed to accord sufficient weight to the opinion of her treating physician, Dr. Conard.  Second, she contends that the ALJ failed to evaluate properly her mental functioning.

I.      *Opinion of Treating Physician Dr. Conard*

The ALJ found that Ms. Reinke had the residual functional capacity to perform light exertional work with the following limitations:  must be able to alternate sitting and standing at her option for one to two minutes per hour; no kneeling, walking on uneven surfaces, crawling, or climing of ladders, ropes or scaffolds; must avoid work at unprotected heights, around dangerous machinery, operating motor vehicles, and being around open flames or large bodies of water; and no overhead work with the left shoulder.  R. 20.  Ms. Reinke challenges the

ALJ's decision not to accord the opinion of her treating physician Dr. Conard controlling weight in determining her residual functional capacity.

Dr. Conard completed a functional capacity assessment for Ms. Reinke in 2001 stating that she could sit for eight hours, and stand and walk each for three hours in an eight-hour workday. The assessment stated that Ms. Reinke could occasionally lift and carry up to ten pounds and could never lift or carry more. It stated that Ms. Reinke could complete simple grasping, pushing and pulling arm controls, fine manipulation, and could use both legs for repetitive movements like pushing or pulling leg controls. The assessment also stated that Ms. Reinke could never crawl or climb, and could occasionally bend, squat, and reach. Dr. Conard recommended moderate restrictions on Ms. Reinke's work near moving machinery, and totally restricted her work near unprotected heights, exposure to marked changes in temperature and humidity, driving automotive equipment, and exposure to dust, fumes, and gases. R. 684. The ALJ characterized Dr. Conard's opinion as essentially stating that Ms. Reinke could perform only sedentary work.

At the hearing level of review, the ALJ is responsible for determining a claimant's residual functional capacity. 20 C.F.R. § 404.1546(c). Although the ALJ considers the opinions of medical sources regarding a claimant's residual functional capacity, resolution of this issue is reserved to the Commissioner. A treating physician's determination that a claimant is "unable to work" or

"disabled" does not require the ALJ to find disability.  20 C.F.R. § 404.1527(e)(1) & (2).

A treating source's opinion regarding the nature and severity of a medical condition should be given controlling weight where the opinion is well-supported by medical findings and consistent with other substantial evidence in the case record.  *Id.* at (d)(2); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). Medical opinions upon which the ALJ should rely must be based on objective medical evidence and not amount to a mere recitation of the patient's reports. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).

When the treating physician's opinion is not given controlling weight as described above, the ALJ may weigh the opinion based on the specialization of the treating source, the length and extent of the treatment relationship, the supportability of the source's opinion, its consistency with the record, and other factors.  20 C.F.R. § 404.1527(d)(2)-(6).

In finding that Ms. Reinke could perform light exertional work, the ALJ explained that he could not accord Dr. Conard's opinion controlling weight because it was both unsupported by medical findings in the doctor's own records and inconsistent with other medical opinions in the record.  Specifically, the ALJ stated that Dr. Conard's own treatment notes failed "to document any significant or persistent neurological deficits."  R. 18.  Plaintiff points out that although Dr.

Conard's records may not have shown neurological limitations, his records showed objective medical evidence of the sources of Ms. Reinke's pain, and that she need not demonstrate neurological deficits to demonstrate that she had pain caused by a condition identified by Dr. Conard.

Some of the evidence in Dr. Conard's records may be considered the kind of recitation of the plaintiff's own complaints that is not generally considered objective medical evidence.  See, *e.g.*, *Rice*, 384 F.3d at 370-71.  Dr. Conard's records, however, include some objective medical evidence, the most obvious being laboratory findings, some of which yielded results consistent with Ms. Reinke's complaints of pain in her back, arms, and knees.  See 20 C.F.R. § 404.1528(c).[6] Additionally, the record shows that Dr. French's 2002 report on Ms. Reinke's neurology consultation, which showed lumbar radiculopathy and some probable and definite denervation, was copied to Dr. Conard.  R. 163-64.  In light of this evidence, and in light of the range of conditions of which Ms. Reinke complains have caused her symptoms, the ALJ's determination that Dr. Conard's evaluation

---

[6]Records from Dr. Conard include:  (1) notations regarding 1997 MRI results that were "essentially normal," except that Ms. Reinke had "patellofemoral syndrome," or "chondromalacia," which correlated with her pain, R. 221; (2) notations that a 2002 x-ray of Ms. Reinke's knee was "negative"; (3) notations regarding 2002 MRI results showing that Ms. Reinke had patellofemoral disease, R. 214, 222; (4) 2002 MRI results copied to Dr. Conard stating that Ms. Reinke had "degenerative Grade I 4-5 anterolisthesis," R. 223; and (5) a 2000 nuclear medicine bone scan result stating that Ms. Reinke had "increased uptake" in her "AC joints consistent with some mild degenerative arthritis," but unremarkable knee uptake.  R. 231.

is unsupported because his records fail to include evidence of neurological deficits is weak at best.

Whether the ALJ erred by finding that Dr. Conard's opinion was unsupported by objective medical evidence, however, does not change the outcome in this case.  The ALJ also cited the inconsistency between Dr. Conard's opinion and that of other medical source opinions in the record as his reason for refusing to accord Dr. Conard's opinion controlling weight.  The ALJ cited the opinions of Dr. Hardin and Dr. Kern, as well as the functional capacity evaluation performed by physical therapist Sheila Denman.  Denman completed a functional capacity evaluation form in December 1999 stating that Ms. Reinke was capable of the following:  (1) sitting six to eight hours per day with regular breaks; (2) standing for six to eight hours per day with breaks at 30 minute intervals; (3) walking six to eight hours per day at intervals of one-quarter mile; (4) lifting up to 22 pounds frequently and up to 45 pounds occasionally; (5) occasionally bending, squatting, kneeling, and climbing stairs; (6) frequently crawling, climbing ladders, working overhead, and pushing/pulling; and (7) "constantly" performing simple and firm grasping and fine manipulation.  Overall, the evaluation stated that Ms. Reinke could meet a medium physical demand level.  R. 631.[7]

---

[7]While a physical therapist is not an "acceptable medical source" whose opinion may be relied upon in determining *whether* the claimant has an impairment, evidence from therapists may be used to determine the *severity* of an impairment or its effect on a claimant's ability to work.  20 C.F.R. § 404.1513(a) & (d)(1).

Dr. Kern wrote that, based on the functional capacity evaluation, Ms. Reinke (1) could not lift anything over 40 pounds on an occasional basis from the floor; (2) could not lift anything over 25 pounds on an occasional basis at or above her shoulder; (3) could not stand more than 30 minutes without a position change; and (4) could not walk for 440 yards without a position change.  R. 608. Dr. Kern's incorporation of the evaluation into his own recommendations demonstrates his agreement with Ms. Denman's appraisal.

In December 1999, Dr. Hardin listed as his only limitations on Ms. Reinke's work that he "would place [Ms. Reinke] on minimal overhead work and no lifting over 20 pounds."  Pr. R. 261.  In January 2000, Dr. Hardin completed a progress report stating that Ms. Reinke had permanent restrictions and could function at "medium capacity."  He wrote that she could not stand for more than 30 minutes without a break, could occasionally lift 25 pounds overhead, could occasionally pull 40 pound stacks down, could occasionally carry and lift 45-90 pound pallets, and could engage in occasional climbing.  Pr. R. 260.

With respect to at least standing and lifting requirements, Dr. Conard's assessment is inconsistent with other medical evidence in the record.  This inconsistency is a proper basis for the ALJ's decision to discount Dr. Conard's opinion as he did.  Additionally, the ALJ incorporated into his residual functional capacity finding several of the items indicated in Dr. Conard's assessment that

were consistent with the other medical opinions in the record.[8]  Accordingly, the ALJ's decision not to accord Dr. Conard's residual functional capacity opinion controlling weight was within the law.[9]

## II.     *Mental Impairments*

Ms. Reinke challenges the ALJ's residual functional capacity finding because it did not include any limitations caused by mental impairments.  Ms. Reinke also argues that the ALJ failed to include in his hypothetical question to the vocational expert limitations of Ms. Reinke's work to unskilled or simple repetitive work.  Ms. Reinke argues that because of these omissions, the ALJ's finding that she was capable of performing light work is not supported by substantial evidence.  The court disagrees.

With respect to Ms. Reinke's mental impairments, the ALJ noted that her GAF consistently ranged from between 55 and 60.  In finding that Ms. Reinke's mental impairments were not severe, the ALJ noted that these impairments did

---

[8]Ms. Reinke also argues that the ALJ ignored evidence that she received multiple injections in an effort to relieve her pain.  The ALJ considered this evidence, citing evidence in the record demonstrating such treatment, and observing that such treatments yielded varying results.  R. 17.

[9]In her argument regarding Dr. Conard's opinion, Ms. Reinke points to the ALJ's comments regarding the July 2004 hearing.  See R. 70 (ALJ stating "We'll throw that one out" regarding Dr. Conard's opinion because Dr. Conard was "[n]ot a treating source anymore").  This evidence is not determinative in the court's analysis.  The ALJ's opinion does not challenge Dr. Conard's status as a treating source, and explains the weight accorded to his opinion independent of the ALJ's comments at the hearing.

not cause her more than mild restrictions or deficiencies in concentration, persistence, or pace. R. 14, 15. The ALJ noted that Dr. Buonanno stated that Ms. Reinke should be limited to work involving simple and repetitive tasks, and that Dr. Cornett's opinion was consistent with this assessment. R. 15. The ALJ explained that the limitation to simple repetitive tasks did not interfere with Ms. Reinke's ability to perform basic work activities defined in 20 C.F.R. § 404.1521(b). The ALJ observed that there was no evidence that Ms. Reinke was unable to understand, remember, and carry out simple job instructions. R. 15. The ALJ also stated that even if Ms. Reinke's mental impairments were found to be severe, she still would not have been "disabled" as defined by the Act before March 2004 because all of the jobs he cited were "unskilled." *Id.*

Ms. Reinke claims that the ALJ erred in omitting a limitation to simple repetitive tasks from his residual functional capacity finding. The residual functional capacity finding is "the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545. The ALJ must evaluate a claimant's residual functional capacity based on all of the relevant evidence in the case record. This includes considering the symptoms of medically determinable, yet non-severe impairments. *Id.*

The ALJ appears to credit the opinions of Dr. Buonanno and Dr. Cornett that Ms. Reinke should be limited to only simple and repetitive tasks. There is no evidence in the record that provides a basis for rejecting such a limitation.

Accordingly, the ALJ's decision to omit this limitation from his residual functional capacity amounts to error.

Additionally, the ALJ omitted a restriction to simple repetitive tasks from his hypothetical question to the vocational expert.  The hypothetical question posed by the ALJ to the vocational expert must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record. *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994).  Where the ALJ erroneously omits impairments or limitations supported by the record, such error does not warrant remand where the record supports the conclusion that the vocational expert has reviewed the medical evidence in the record.  *Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 540-41 (7th Cir. 1992) (ALJ's failure to incorporate into the hypothetical limitations reflecting claimant's psychologically-based symptoms did not warrant remand where vocational expert testified that he had reviewed the record), but see *Young v. Barnhart*, 362 F.3d 995, 1003-04 (7th Cir. 2004) (reliance on vocational expert's familiarity with the record is inappropriate where the ALJ asks multiple fact-sensitive questions for the purpose of ruling out specific disability factors).  In the present case, however, there is no evidence that vocational expert Brown was familiar with the case record before the hearing.  Neither the ALJ nor the plaintiff, who was represented by counsel, elicited testimony showing Ms. Brown's familiarity with the record.

The issue, however, is whether these omissions amount to error warranting remand.  See, *e.g.*, *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (affirming ALJ's findings, applying doctrine of harmless error to ALJ's decisions); *Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (same).  The court finds that they do not.  These omissions, however easily avoided, do not undermine the ALJ's finding that Ms. Reinke was capable of performing the jobs listed by the vocational expert.  The ALJ stated in his opinion that all of the jobs listed that Ms. Reinke could perform were unskilled.

Social Security Ruling 85-15 states that the "basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions . . . ."  The regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time," and state that "a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed."  20 C.F.R. § 404.1568(a); SSR 83-10.  Social Security Ruling 82-41 demonstrates that although the level of skill required by a job may not always be self-evident, the level of skill required by some jobs can be apparent.  SSR 82-41 ("It should be obvious that restaurant dishwashers are unskilled.").

The vocational expert testified that the individual described in the ALJ's hypothetical question could perform jobs as a cashier, general office clerk, mail

clerk, traffic shipping and receiving clerk, and a stock and inventory clerk.  The vocational expert testified that approximately 33,100 such jobs existed in these categories in the State of Indiana.  R. 60.  Even if some of these jobs might under certain circumstances be considered semi-skilled, there is no evidence before the court that all, or even most, of the jobs listed are semi-skilled and therefore beyond Ms. Reinke's ability.  For example, Ms. Reinke has attached to her reply brief a document that appears to be a description of a mail clerk position.  Docket No. 29, Ex. 1.  Even Ms. Reinke's evidence shows that the tasks required to perform a mail clerk position can be learned in fewer than 30 days and that the job is considered "unskilled."  *Id.*

Because the ALJ's ultimate finding that Ms. Reinke was capable of performing work existing in significant numbers before March 2004 is supported by substantial evidence in the record, his omission of limitations as to simple repetitive tasks amounts to harmless error that does not warrant remand.

*Conclusion*

For the foregoing reasons, the court finds that the ALJ's decision that Ms. Reinke was not disabled within the meaning of the Social Security Act before March 9, 2004 was supported by substantial evidence in the record, was within the law, and therefore should be AFFIRMED.  Final judgment shall be entered accordingly.

So ordered.

Date: May 4, 2006

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

James F. Roth
jim@jimrothlaw.com